# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**QUEEN E. GLYMPH,**

      **Plaintiff,**

      **v.**

**DISTRICT OF COLUMBIA,**

      **Defendant.**

**Civil Action No.  01-1333 (JMF)**

## FINDINGS OF FACT AND MEMORANDUM OPINION

On May 1, 2003, the jury returned a verdict for the plaintiff.  I have already determined, by my Order of May 7, 2003, that relief in this case will consist of $50,000 in compensatory damages, in accordance with the jury's verdict, and attorneys fees.  I have also already determined that plaintiff is entitled to back pay and injunctive relief.  Defining how to determine back pay and the precise nature of the injunctive relief to be awarded necessitated my holding an evidentiary hearing.  I am now ready to issue my Findings of Fact, Conclusions of Law, and accompanying Memorandum Opinion.  I will begin, however, by stating those facts that are not in genuine dispute or, if in dispute, were resolved in plaintiff's favor by the jury's verdict.  I will then indicate what the jury determined and the positions the parties took in the post-verdict proceedings.  I will then provide the findings of fact and conclusions of law I am issuing based on the post-verdict evidentiary hearing.  Finally, I will explain the injunctive relief I am awarding and my reasons for doing so.

**FACTS ADMITTED TO BE TRUE OR RESOLVED IN
PLAINTIFF'S FAVOR BY THE JURY'S VERDICT**

1.     Plaintiff first began working for the District of Columbia Department of Human

Services Commission in June of 1987.  In January of 1995,[1] plaintiff began

working as a Program Analyst.

2.     On May 17, 1995, while working as a Program Analyst, grade 12 step 9, plaintiff

was in a car accident while on the job.  As a result of her injuries, plaintiff began

receiving Workers' Compensation.

3.     On April 15, 1997, plaintiff received notice of a proposal to remove her from her

Program Analyst position.

4.     On May 13, 1997, plaintiff attempted to return to work on full-time basis but was

unable to do so and therefore informed defendant that she would only be able to

return to work on a part-time basis.

5.     On June 9, 1997, defendant informed plaintiff that it would not be able to

accommodate her by allowing her to work part-time.

6.     On December 9, 1997 and October 1, 1998, plaintiff's physician, Dr. Moskovitz,

developed return to work plans.  According to the plans, plaintiff was cleared to

return to work starting at four hours per day and to eventually assume a full eight

hour day.  In addition, Dr. Moskovitz indicated that it would be preferable if

plaintiff were permitted to begin work at 10:00 a.m.

---

[1] Although the year that plaintiff began working as a Program Analyst is obliterated on
the copy submitted to court as Plaintiff's Exhibit 13, the court has no reason to believe that it was
not January of 1995.

7.      On July 29, 2000, plaintiff's employment with the Commission on Mental Health

Services was terminated.

8.      In December of 2001, Congress abolished the Commission on Mental Health

Services and created the Department of Mental Health.

## THE JURY'S FINDINGS

In her complaint, plaintiff stated that she was capable of returning to work pursuant to the

work plans Dr. Moskovitz created but that the District of Columbia (hereafter "the District")

failed to accommodate her in violation of the Americans with Disabilities Act, 42 U.S.C. §

12111. [2]  The jury agreed and found, in response to specific questions, that:

1.      Plaintiff was a qualified individual with a disability under the

Americans with Disabilities Act.

2.      The accommodations she sought were reasonable and the defendant

failed to provide them.

3.      Plaintiff's disability was a substantial factor in the District of

Columbia's decision to refuse to allow her to return to work under

the terms of her return to work plans and in its decision to terminate

her employment.

## THE POST-VERDICT PROCEEDINGS

While the parties are agreed as to the back pay to be awarded and the District is content to

leave the amount of the attorneys' fees to be awarded to my discretion, they differ as to my

---

[2] All references to the United States Code are to the electronic version that appears in
Lexis or Westlaw.

3

ordering plaintiff to be reinstated to the position from which she was discharged.

The District insists that in 2003 the Department of Health conducted a reduction in force that abolished the division where plaintiff worked and that, had she been in her position, she would have been separated from her employment on April 4, 2003.  According to the District, "as of April 4, 2003, plaintiff's employment with the District of Columbia would have ended and she is not entitled to reinstatement."  <u>Defendant's Response to Plaintiff's Motion for Equitable Relief</u> at 2-3.

For her part, plaintiff asks the court "to reinstate her to a position equivalent to her Program Analysis position with the promotion she would have received had defendant accommodated her injury."  <u>Motion for Equitable Relief</u> at 3-4.

## POST-VERDICT FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.  With the reduction in force that occurred after plaintiff was terminated, the Planning Division of the Department of Mental Health was abolished and with it, plaintiff's position.  Several of the people with whom plaintiff worked before the reduction in force found other positions with the Department of Mental Health. At least one of them, Patricia Dunston, was competitively promoted from a GS-13 to a GS-14 after plaintiff was terminated and her position abolished as part of the reduction in force.

2.  A person employed by the Department of Mental Health must hold the position of a GS-12 for one year before becoming eligible to become a GS-13.

3.  Ivy Maria McKinley is the Director of Human Resources of the Department of Mental Health, an agency that employs 1,670 employees.

4.      Ms. McKinley testified that persons, like plaintiff, who return to work after recovering from the illness or injury that rendered them disabled are not entitled to any priority consideration whatsoever.  Instead, Ms. McKinley indicated that such persons must reapply for a position if the position they previously held was abolished or is otherwise no longer available.

5.      In determining whether she could offer plaintiff a position, Ms. McKinley consulted with officials responsible for administering the Workmen's Compensation program in the District of Columbia. It was one of those officials who spoke to plaintiff about the duties and responsibilities attendant to any new position and then asked Ms. McKinley to offer the one position that was in fact offered.

6.      Ms. McKinley offered plaintiff a position in Care Coordination.  In this position, plaintiff would have answered hotline phone calls from emotionally distressed people in need of psychiatric services.  Plaintiff was also offered training in the use of the computer system used to document the calls.

7.      The hotline position description indicated the following: "Licensure is required for this position in accordance with MHRS regulations for an approving practitioner."  Position Description attached to Plaintiff's Notice of Filing, Docket Number 51.

8.      Plaintiff wrote a three page letter explaining why this position was not comparable to the position she had when she was terminated.  Plaintiff explained that she did not have the required license, the position offered was temporary, her former

position was permanent and in her former position, she had absolutely no contact with mentally ill persons.

9.   Ms. McKinley indicated that she knew of no reason why plaintiff was unqualified to fill a position as a quality assurance officer, a position that had been open but not offered to plaintiff.  The manager of the quality assurance office, however, wanted the position advertised as a GS-14.  Plaintiff was a GS-12 when terminated.

10.   Ms. McKinley also determined that plaintiff could not have fulfilled the requirements of another different open position because it would have required plaintiff to actually survey the grounds of certain facilities and Ms. McKinley understood that plaintiff could not do much walking.  Plaintiff, however, is now able to walk one mile and does so each day as part of her therapy.

11.   Ms. McKinley admitted that plaintiff could have learned the regulations and laws that pertain to a position in quality assurance management but the position was not offered to her.

12.   Ms. McKinley indicated that plaintiff might be able to perform the duties of another position as a family coordinator, a position that was advertised in 2003.

13.   Ms. McKinley further indicated that plaintiff could have learned the duties of three other positions that were once open: homeless services coordinator, quality improvement coordinator, and quality improvement monitor.

14.   Another position that was available was that of Consumer Rights Advocate, but the person hired for this position was usually a person who was recovering from

mental illness or who had family members who were.  Ms. McKinley was not

aware that plaintiff was herself being treated for depression because of her

fibromyalgia.

15.    Ms. McKinley was neither aware nor made aware that the jury verdict in this case

imposed upon her an obligation to find a job for plaintiff.  She spoke exclusively

with officials at the office of Workmen's Compensation about finding a position

for plaintiff and never consulted with plaintiff nor her doctor about whether she

could be reasonably accommodated in order to fulfill the requirements of

positions that became available after plaintiff's termination.

16.    Without consulting with anyone other than officials in the Office of Workmen's

Compensation, Ms. McKinley believed that her only role was to locate, based on

the limitations specified by the employee's physician, an available position.

McKinley indicated that she did not believe the department had any obligation to

create a position for plaintiff and that it would only do so as a final resort and only

if there was money already budgeted for that position.  As a result, McKinley

searched only for part-time positions that gradually became full-time positions,

started after morning rush hour, required only four hours of work per day, had a

low physical demand job classification that did not require working over shoulder

height, had a lift limit of 5 pounds, allowed for frequent breaks while working in a

seated position, allowed for ten minutes of an altered position, and allowed for

light activity after thirty minutes of sitting.  Ms. McKinley also understood that

plaintiff would have to be provided with an ergonomic work station, to include an

adjustable keyboard and mouse tray, four-way adjustable orthopaedic desk chair

with added lumbar support, and standing keyboard/mouse with foot stool.

17.     The one position that Ms. McKinley offered plaintiff was a temporary

appointment that would have lasted 13 months.  Ms. McKinley hoped that it

would put plaintiff in a prime position to secure other employment with the

Department of Mental Health once the appointment ended.  Additionally, she

picked a temporary position because at the time, plaintiff's doctor was unsure

whether plaintiff could work full time.

18.     According to Ms. McKinley, there are very few part time positions available in

the Department of Mental Health but a full-time position can be reduced to part-

time.

19.     Finally, according to Ms. McKinley, had plaintiff been employed in a part-time

position and then been able to work full-time, her managers would have had to

secure approval to permit her part-time, temporary position to become a full-time,

permanent position.

20.     Lewis Clark Norman has been employed by the District of Columbia in various

positions for thirty years.  His work for the District began on October 1, 1987 as

Chief of the Personnel Operations Branch for St. Elizabeth's at the time of the

hospital's transfer from the United States to the District of Columbia.

21.     He then became Chief of Position Classification for Service and Personnel in the

D.C. Office of Personnel Management.

22.     Ultimately, he became Assistant Director of the D.C. Office of Personnel, thus

8

becoming the personnel officer for the Department Of Human Services. A constituent element of the Department of Human Services was the Commission of Mental Health Services.

23.   Mr. Norman testified that, based on his experience, an agency attempts to place an employee returning to work from workmen's compensation in the position the employee had prior to becoming disabled.  Mr. Norman also testified that if the position is unavailable, the agency places the returning employee in a position for which she currently qualifies, at the grade and pay level that she held before she was disabled.

24.   Mr. Norman indicated that, based on his experience with the management and program analyst type positions, most were career ladders to Grade 13.  Therefore, assuming satisfactory job performance, plaintiff could have expected to receive career ladder promotions to Grade 13.

25.   According to Mr. Norman, it was normal and ordinary for an agency to search the entire District government to find a position for an employee returning to work after being disabled.

26.   The process is the same for a successful plaintiff in a discrimination action: the concerned agency would place the employee in a position she held prior to her termination.  If the position no longer existed, then the agency would attempt to place the employee in a position where the grade and pay was equivalent to that being received by the employee received prior to her leaving the agency.

27.   According to Mr. Norman, it is very easy for an agency to create a position to

accommodate the returning, successful plaintiff if funding is available.  Mr. Norman also indicated that agencies are particularly flexible in accommodating successful plaintiffs by permitting a position to be filled on a part-time basis.

28. If a there is a vacancy at the grade 13 level, a GS-12 employee, otherwise eligible for promotion, could fill the position if the position were advertised as a 12/13.

29. Mr. Norman testified that plaintiff was qualified for one position which, while open, was not offered her: family services coordinator.

30. According to Mr. Norman, a position can be filled non-competitively for a plaintiff who successfully overturned her separation.  In such a situation, the agency is not obliged to advertise the position; all it need do is place the employee in the available position.

31. If a position is filled non-competitively, in the above described manner, it can be filled at the level is that is necessary to find a position for the successful plaintiff.

32. It has been Mr. Norman's experience that both federal and District of Columbia agencies attempt to place the successful plaintiff non-competitively.

33. District agencies are permitted to allow job sharing and can therefore permit an employee to work part-time in the hope that the employee can ultimately work full time.

34. District agencies may also permit employees to fulfill their duties by working at home.

35. According to Mr. Norman, job sharing is common in District agencies.  In Mr. Norman's opinion, there would be no problem whatsoever if a single full-time

position was shared by plaintiff and another person.  Indeed, according to Mr.

Norman, the only "problem" that the agency would have would be selecting from

the twenty or thirty people who would apply to share the full-time position with

plaintiff.

36.     Queen Glymph, the plaintiff, testified that at one point in her career she was a GS-

13, when she served as quality assurance coordinator for the South Center.

Additionally, in 1995, she made the highly qualified list for a GS-14 position.

37.     Ms. Glymph applied for the family coordinator position but was told by Sharon

Lofton that she was not qualified for the position because she was neither a

mentally ill person nor had a family member who was mentally ill.

38.     Ms. Glymph protested to Ms. Lofton that neither of these considerations were

listed in the ranking factors for the position and further advised Ms. Lofton that

she met the qualifications because she had an immediate family member who

received services from the District's mental health system.

39.     In 1997, Ms. Glymph applied for a position in quality assurance at St. Elizabeth's

hospital, but did not receive it.  She also applied for positions as a homeless

coordinator with the Community Services Agency and as a forensic services

coordinator at St. Elizabeth's Hospital.  She got no response to either application.

40.     Ms. Glymph provided letters from her physicians explaining why they believed

that her physical and emotional condition did not permit her to perform the one

job offered her.

41.     If Ms. Glymph was offered a position that would require her to be at work before

9:30 a.m., she could take a cab to work.

42.     Since her position was terminated, Ms. Glymph has applied for over 1,000 jobs but has been unable to secure employment.

43.     At no point have representatives of the Department of Mental Health or St. Elizabeth's Hospital ever sat down with Ms. Glymph and tried to work with her to find a job commensurate with her skills, abilities, and limitations.

### CONCLUSIONS OF LAW

1.     The one position that the Department of Mental Health offered plaintiff was not comparable to the position from which she was terminated.

2.     There were positions that were vacant after plaintiff was terminated, for which she was qualified and for which she could have been hired, if the Department had offered her a reasonable accommodation.

3.     The Department of Mental Health never conferred with either plaintiff or her physicians, in determining whether she could perform the duties of positions that were available after her termination.  The Department never engaged in any interactive or other process to see if she could be reasonably accommodated in any one of these positions.

4.     Plaintiff made yeoman efforts to find a job after she was terminated.  Her refusal to accept the one position she was offered was not unreasonable because the job offered her was not comparable to her former position.  It required a license she lacked and she was not physically capable of performing it.  Plaintiff therefore did everything she could to mitigate her damages.  Her refusal to accept the one job

that was offered is insignificant.

5.       While it is more likely than not that plaintiff would have been promoted had she

not been terminated, it is impossible on this record to state when it is more likely

than not that promotion would have occurred.

## MEMORANDUM OPINION

Upon the return of a favorable jury verdict, successful plaintiffs who have been

victimized by discrimination are entitled "'so far as possible, [to be] restored to a position where

they would have been were it not for the unlawful discrimination.'" Albemarle Paper Co. v.

Moody, 422 U.S. 405, 421 (1975) (quoting 118 Cong. Rec. 7168 (1972) (statement of Sen.

Williams)).  Accordingly, courts are granted broad discretionary powers to accomplish this goal.

Id.  One of these powers is reinstatement.  See e.g. Lander v. Lujan, 888 F.2d 153 (D.C. Cir.

1989) (finding reinstatement an appropriate remedy even though it involved "bumping" the

innocent incumbent).

Reinstatement is the presumptive remedy to make a successful plaintiff whole, though

courts have recognized that there are exceptional circumstances sufficient to rebut the

presumption.  Robert Belton, Remedies in Employment Discrimination Law, § 7.16 at 236

(1992).  Cf. Pollard v. E.I. duPont de Nemours & Co., 532 U.S. 843 (2001) (noting that courts

have ordered front pay as a substitute for reinstatement where reinstatement is not viable).

Typically, an employer challenging reinstatement will argue either that the hostility between the

employee and management makes reinstatement self-defeating or claim that the successful

plaintiff's job "was abolished for legitimate, nondiscriminatory reasons."  Belton, § 7.16 at 236-

37.  However, even in situations where a legitimate and neutral reduction in force eliminates a

successful plaintiff's job, that plaintiff cannot truly be made whole without reinstatement to a comparable position.  The employee in that scenario, without a comparable position to return to, must resort to his or her own devices to regain rightful employment status, despite a jury's determination that the employee was unlawfully terminated, demoted or not given an earned promotion.  Permitting a reduction in force, however legitimate, to eliminate any responsibility on the employer's part to find comparable work for a successful plaintiff nullifies the jury's verdict and takes from the court its obligatory power to provide the plaintiff with the most complete relief possible.

Thus, a moment's thought compels the conclusion that the District's assertion that the reduction in force somehow relieves it of any responsibility to reinstate this plaintiff is fundamentally flawed.  That plaintiff's old job has been abolished, thereby rendering it impossible for her to be reinstated to it, only increases the responsibility of the discriminating agency to find the plaintiff comparable employment.  Compelling the District to provide such accommodation is asking no more or less of it than to discharge the responsibilities that were incumbent on it from the first.  In addition, the goals of deterrence and prevention should inform the remedy afforded to a successful Title VII plaintiff.  See Lussier v. Runyon, 50 F.3d 1103, 1111-12 (1st Cir. 1995).  An employer hardly needs encouragement to abolish a job if, by so doing, he can escape responsibility for the harm caused.

Because the reduction in force increases, rather than diminishes, plaintiff's right to reinstatement to a comparable position, the District can only escape reinstatement if it can establish that it in fact offered plaintiff a position that was comparable, but that she declined to take it.  The District argues that it offered plaintiff a position as a clinical care coordinator, with

the responsibility of maintaining a hot-line for the mentally ill.  But, as I have found, the position was not comparable to the position plaintiff previously held and, in any event, plaintiff was not qualified for the position nor physically able to perform it.  Since the District cannot escape from its responsibility to reinstate the plaintiff to a position comparable to the one she lost, the question of how the District must do it cannot be avoided.

In this case, the question of what equitable relief is to be awarded plaintiff is so complicated because the traditional roles are nearly reversed.  In a traditional case, the employee seeks front pay in order to find a job with another employer.  In this case, plaintiff is nearly desperate to return to work with District of Columbia Department of Mental Health and would gladly forgo any front pay for an offer of a comparable position.  Again, in the traditional case, the employer is given an economic incentive to find the successful plaintiff comparable work because, if the employer does not, the employer will have to pay the employee front pay for not working as opposed to paying her for actual work.  Unfortunately, the District lacks this incentive.  Since plaintiff is considered disabled and is currently receiving disability payments, the District, by not offering plaintiff comparable work, loses nothing since it is already making disability payments to plaintiff.  Therefore, the District has every interest in maintaining the status quo and understandably argues that, with plaintiff's position eliminated by the reduction in force, her continued and indefinite receipt of disability payments suffices.

The unusual posture of this case requires the most creative use of the court's discretion to create incentives so that plaintiff's desire to return to work can be fulfilled, if at all possible.  By the same token, the relief must be fair to the District of Columbia.  Unfortunately, plaintiff may not be able to immediately return to work on a full-time basis.  To pay her full-time front pay into

the indefinite future assumes what is yet to be proved: that she is fully capable of returning to work on a full-time basis.  To do so would be to give her the kind of "windfall" that the courts have condemned because she is not presently capable of working forty hours a week.  The only solution that seems fair to me is to take the matter in stages, as defined by plaintiff's physical condition.

The first stage is the present, in which plaintiff is receiving and will continue to receive disability payments.  During this stage, the District will have to offer to plaintiff any vacant position in the Department of Mental Health or at St. Elizabeth's Hospital that is comparable to the position she held and for which she is qualified.  More specifically, the District will collect all existing vacancy announcements and make them available to plaintiff who will then have a reasonable time to review them and apply for any existing vacancy.  The District will then have to offer plaintiff any such position for which she is qualified, provided that plaintiff's doctor certifies that she can perform the job without endangering her health.  The District will have to offer the position even though plaintiff may only be able to encumber it on a part-time basis and will need reasonable physical and environmental accommodations to fulfill the requirements of the position.

I will retain jurisdiction to adjudicate any dispute that emerges between the parties, including, but not limited to, the following: (1) whether the position(s) the District has available are comparable to the position that plaintiff had; (2) whether the plaintiff is qualified for the position(s) for which she will apply; (3) whether the physical and environmental accommodations plaintiff needs to fulfill the requirements of the position(s) are reasonable.

If plaintiff refuses to accept an offered position and the District claims that the position is

comparable and that it can accommodate plaintiff to fulfill its requirements on at least a part-time basis, I will determine the suitability of the position.  If I determine that the position offered plaintiff is not comparable or that plaintiff cannot fulfill the requirements on a part time basis, the District will have to begin paying plaintiff the salary she was earning when she was terminated, and continue until it offers her a position that is comparable (provided her doctor certifies that she is able to fulfill the requirements of a truly comparable position on at least a part-time basis with any necessary and reasonable accommodations).  If plaintiff's doctor certifies that plaintiff is only able to work on a part-time basis, the payment due plaintiff will be adjusted downward to reflect the following: (1) that she is only working on a part-time basis and (2) that any disability payments she receives will be because she is still viewed as being partially disabled.

If, on the other hand, I determine that the position is comparable and that plaintiff can fulfill its requirements on at least a part-time basis, but plaintiff refuses to accept the position, the District will have no obligation to pay plaintiff anything more than the disability payments which she is or will be receiving.

The second stage will begin when plaintiff accepts a position.  If, after a period of time, her doctor certifies that plaintiff can fulfill the requirements of the position on a full-time basis, with reasonable accommodations, the District will offer her that position on a full-time basis with those reasonable accommodations.  If it refuses for any reason whatsoever, it must pay plaintiff what it would have paid her had she been employed in the position on a full-time basis until it offers plaintiff that position on a full time basis.  Again, I will retain jurisdiction to resolve any disputes that arise between the parties as to the fulfillment of the obligations I am imposing.

**Back Pay**

When asked whether plaintiff has established by a preponderance of the evidence that her disability was a substantial factor in the District of Columbia's decision to "refuse to allow her to return to work under the terms of her return to work plans and to terminate her employment," the jury answered "yes." The return to work plans to which the question referred were prepared by Dr. Moskovitz and indicated that plaintiff would have been able to return to work for four hours a day as of December 9, 1997, and full time as of January 1, 1999.

The parties are agreed that for the period from June 9, 1997 to December 9, 1997, plaintiff should be compensated at a rate of two hours per day, and for the period from December 9, 1997 to January 1, 1999 at a rate of four hours per day. They also agree that compensation would be at the same rate of pay as her prior position, GS-12, step 9, with an annual salary of $49,045. At that point, the agreement ends.

### The Parties' Positions

Plaintiff contends that, at a minimum, she is entitled to back pay from January 1, 1999 to the date of her reinstatement, on a full-time basis. I say "at a minimum" because plaintiff demands that she be promoted to a GS-13 position as of January 1, 2001 upon the theory "that there were a number of vacancies at the GS-13 level, and it is logical to conclude that she would have been selected for one of these positions by January 1, 2001." Plaintiff's Supplemental Motion for Equitable Relief at 2. [3]

Defendant contends that she is only entitled to the workmen's compensation she has

---

[3] In light of my resolution for plaintiff's motion for equitable relief under the ADA, there is no reason for me to consider claims premised on D.C. Municipal Regulations.

already received.

## Plaintiff is Entitled to Back Pay

Obviously, the parties' positions as to back pay are a reprise of their positions as to reinstatement and the District's suffers from the same flaw: it is inconsistent with the jury's verdict.  As I have noted, the only information in the record pertaining to plaintiff's return to work in the period from her termination to the present is Dr. Moskovitz's work plan, which indicated that plaintiff would have been able to return to work on a part-time basis on December 9, 1997 and on a full-time basis on January 1, 1999.  The jury specifically concluded that the District's rejection of the work plan Dr. Moskovitz created violated plaintiff's rights under the Americans with Disabilities Act.  To give that verdict its proper force, I must conclude that it is more likely than not that plaintiff would have returned to work on a full-time basis on January 1, 1999.  The District's contrary conclusion– that plaintiff is not entitled to anything more than the workmen's compensation she has already received– ignores the only record evidence to the contrary: Dr. Moskovitz's opinion.

I am the first person to admit that there is an air of unreality surrounding awarding plaintiff a full-time position as of 1999 when, as this is being written, she is still receiving disability payments that I assume could only be made if she was not capable of working full-time.  But, the District does not suggest and I cannot find any other conclusion that meets the probative force of the testimony concerning the work plan.  According to that testimony, the District lost an opportunity to provide plaintiff with part-time work that could have then led to full-time work.  The consequences of its squandering that opportunity must be visited on the District, not plaintiff.  Bartek v. Urban Redevelopment Auth. of Pittsburgh, 882 F.2d 739, 746-47

(3d Cir. 1989).  While the solution described above is hardly lapidary, to ignore Dr. Moskovitz's

work plans, as read through the prism of the jury's verdict and its answer to the specific question

given them, would be to abuse my discretion merely because the reality of this case compels me

to base my determination on a physician's estimate of what would have happened.

**Plaintiff's Claim that she would have been Promoted as of January 1, 2001 is Speculative**

The testimony as to whether plaintiff would have been promoted is remarkably

contradictory.  Indeed, Ms. McKinley's description of the personnel system as rigid and

Procrustean so contrasted with Mr. Norman's depiction of it as free-form and flexible that it is

hard to believe that they were describing the same system.  Plaintiff was a GS-12 and some of the

positions that were vacant in the period after her termination and before the post-verdict hearing

were advertised as either GS-13 or GS-14.  According to Ms. McKinley, plaintiff could not be

given the GS-13 positions because she was a GS-12; she would have to compete for such

positions.  Mr. Norman, on the other hand, insisted that such positions could have been

advertised at the GS 12/13 level and thus filled by either a GS-12 or a GS-13.

In addition, Ms. McKinley was adamant that because plaintiff was not in a career ladder

position before she was terminated, she would have not achieved a promotion without actually

competing for a position that had a GS-13 rating.  Mr. Norman saw promotion solely as a

function of the satisfactory performance of duties.  According to him, given the satisfactory

performance of duties and "other things being equal," employees like plaintiff could "expect to

receive career ladder promotions up to Grade 13."[4]  Thus, as I understand Mr. Norman's

testimony, had plaintiff remained employed, she would have achieved a GS-13 position.  Had she

---

[4] Transcript of Evidentiary Hearing held on November 29, 2004 at 135.

achieved GS-13, she would have qualified for any vacancy advertised as GS-13 or GS-13/14. Moreover, according to Mr. Norman, management could fill any position without competition in order to accommodate a legal obligation to reinstate a successful plaintiff in a discrimination case or other action.

While I think it more likely than not that plaintiff would have qualified for one of the vacant positions and while I credit Mr. Norman's testimony that the District could fulfill a position non-competitively to reinstate a successful plaintiff, I cannot accept and use as a premise for a damage award plaintiff's contention that this would have occurred by January 1, 2001. That date does not bear any relation to any evidence in this record. It is not related to the date of any announcement, let alone to the specific announcement that plaintiff claims she would have received nor to any record evidence whatsoever as to how much time can reasonably be expected to transpire between the publication of the announcement, the selection being made, and the vacancy being in fact filled by a new incumbent. In the absence of such evidence, to pick a date "out of the sky" because it happens to be the first day of a new year crosses the line, familiar to front pay cases, between making responsible estimates from known facts and gratuitous speculation.[5] I will therefore not deem plaintiff to have been entitled to a promotion as of January 1, 2001.

## Loose Ends

There are several loose ends that must be tied up before I can enter final judgment, which I am anxious to do.

---

[5] See, e.g., Peyton v. DiMario, 287 F.3d 1121, 1129 (D.C. Cir. 2002) (holding that the district court's "award of 26 years of front pay was unduly speculative and therefore an abuse of discretion.")

First, I will direct the parties to meet and confer in order that they arrive at an agreed-upon amount of back pay, calculated in accordance with this opinion, i.e., from the date of plaintiff's termination to the date of this opinion, less all the workmen's compensation that has been paid plaintiff in the same period.

Second, I must advise the District that it is my intention to award pre-judgment interest, to be calculated from the date of plaintiff's termination to the date of this opinion.  I will allow the District ten days to show cause as to why I should not make this award.

Third, plaintiff's counsel will file an amended fee petition, seeking payment of all fees and costs incurred from the first date indicated in its initial petition to the date of this opinion.

An order accompanies this Memorandum.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated: June 27, 2005